Filed 8/5/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| BROOKE KNAPP, | B307559 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 19STCV11400) |
| v. | |
| LARRY GINSBERG et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Christopher K. Lui, Judge. Reversed.

Glaser Weil Fink Howard Avchen & Shapiro, Barry E. Fink, Adam Pines and Elizabeth Chilton for Plaintiff and Appellant.

Haight Brown & Bonesteel, Arezoo Jamshidi, Jennifer K. Saunders for Defendants and Respondents.

Before they married in 2004, appellant Brooke Knapp and her late husband, Grant Tinker, signed a premarital agreement (PMA) that in relevant part governed the ownership and testamentary disposition of their marital home, the Perugia property. Respondents Larry Ginsberg and his law firm, Harris-Ginsberg LLP (collectively Ginsberg), represented Knapp in connection with the PMA and approved the PMA as to form on her behalf. Non-attorney Sidney Tessler, Tinker's longtime accountant and business manager, negotiated terms and approved the PMA as to form on Tinker's behalf. Although the PMA stated that Tinker had been represented by and consulted with independent legal counsel, no attorney signed on Tinker's behalf. Tinker did not sign a separate writing expressly waiving representation by independent legal counsel, as is required by Family Code section 1615 ("section 1615") for unrepresented PMA signatories.

During the marriage, Tinker made several amendments to his trust and estate plan, some of which concerned the Perugia property. After Tinker's death in 2016, three of his adult children filed probate petitions to set aside two of the amendments, which they alleged were the product of Knapp's undue influence. Meanwhile, Knapp sold the Perugia property and sought reimbursement from Tinker's estate for the approximately $4 million she spent to pay off the mortgage, as provided in the PMA. Knapp, the estate, and the children litigated Knapp's and the children's claims, all of which they ultimately resolved in a global settlement. The settlement's provisions regarding the Perugia property were less favorable to Knapp than the PMA had been.

Knapp subsequently sued Ginsberg for legal malpractice in connection with the preparation and execution of the PMA. She alleged the PMA was unenforceable due to Ginsberg's failure to ensure that Tinker signed a waiver of legal representation. Ginsberg moved for

summary judgment.  He argued that Knapp's claim was barred by the statute of limitations and that she was unable to prove the causation and damages elements of her claim because section 1615 was inapplicable, there was no evidence that Tinker lacked legal counsel, Tinker ratified the terms of the PMA via the trust amendments, and Knapp's legal fees stemmed from the probate claims against her. The trial court granted the motion on the ground that Tinker ratified the PMA.

Knapp appeals, and we reverse. As the trial court recognized, there is a triable issue of material fact as to the threshold issue of whether Tinker satisfied the requirements of section 1615 when he executed the PMA. If the factfinder determines that Tinker did not comply with section 1615, and the PMA was therefore not enforceable, the question becomes whether Tinker's subsequent amendments to his estate plan could ratify the PMA and thereby rectify the statutory violation.  The trial court concluded they could and did, because contracts that are voidable for lack of due consent may be ratified by subsequent consent (Civil Code, § 1588), and Tinker's amended estate plans evinced that consent as a matter of law.  Knapp contends, and we agree, that this conclusion was in error. A premarital agreement that is not enforceable under section 1615 is void, not voidable, and accordingly cannot be ratified.  As none of the other grounds asserted in the summary judgment motion support the trial court's ruling, we reverse and remand for further proceedings on Knapp's malpractice claim. Knapp's request for judicial notice is denied as moot.

## BACKGROUND

We view and recite the facts in the light most favorable to Knapp, the party opposing summary judgment. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).)

### I.  Parties

Knapp, a realtor, is the widow of Tinker, a former television executive to whom she was married from April 5, 2004 until Tinker's death on November 29, 2016.  Tinker had four adult children from a previous marriage: John Tinker, Michael Tinker, Jodie Dilella (collectively "probate petitioners"), and Mark Tinker ("Mark"), all of whom survived him.

Larry Ginsberg is a California attorney and certified family law specialist.  He is a partner at the law firm Harris-Ginsberg, LLP.  Tessler is an accountant who served as Tinker's business manager.

### II.  PMA

Knapp "understood [Tinker] to be very wealthy,"[1] but her primary concern prior to the marriage was ensuring that she would have rights in the marital home if Tinker predeceased her.  Knapp and Tinker decided to execute a PMA to address Knapp's concern.  Knapp

---

[1] Ginsberg objected to this statement and many others below. The trial court did not address the bulk of Ginsberg's evidentiary objections in its summary judgment ruling.  We accordingly presume the objected-to evidence was admitted and considered by the court. (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 534.)  There is a "burden on the objector to renew the objections in the appellate court."  (*Ibid.*) Ginsberg's assertions that various pieces of evidence were inadmissible, supported only by references to his objections below, are not sufficient to carry this burden. (*Duffey v. Tender Heart Home Care Agency, LLC* (2019) 31 Cal.App.5th 232, 251 fn. 17.)  Moreover, Ginsberg cites this statement about Knapp's understanding of Tinker's financial status in the argument section of his response brief.

retained Ginsberg to represent her in connection with the PMA on March 9, 2004.

Over the next few weeks, Ginsberg negotiated the PMA with Tessler and communicated with Knapp via email. Knapp and Tinker signed the PMA on March 25, 2004. Ginsberg initialed every page of the PMA and approved it as to form in his capacity as "Representative of Brooke Knapp." Tessler initialed every page of the PMA and approved it as to form in his capacity as "Representative of Grant Tinker."

Paragraph 7(a) of the PMA stated that Tinker was "in the process of purchasing a new residence [the Perugia property] which the parties contemplate they will own, jointly, and in which the parties contemplate they will reside." It further stated that Tinker "will use his separate funds for the purchase of the house, which will be purchased with a combination of cash and encumbrance."

Paragraph 7(b) provided that the Tinker would take title of the Perugia property in his own name or in the name of his trust. Immediately thereafter, he would transfer title to Knapp jointly as community property. In paragraph 7(d), Tinker further agreed to "pay from his separate funds all costs associated with the Perugia property including any debt service associated therewith, utilities, repairs and maintenance, gardener, insurance, redecorating, property taxes, housekeepers, etc. without the right of reimbursement to Grant for the use of such funds." During her deposition and in a declaration, Knapp estimated these costs totaled approximately $30,000 per month at the time of Tinker's death.

Paragraph 7(e) stated what would happen to the Perugia property "[i]n the event Grant predeceases Brooke": "Brooke shall receive Grant's undivided one-half (1/2) interest in the residence free and clear of any encumbrance, lien, assessment, or other debt. For the

5

period of three (3) years from the date of Grant's death, Grant's estate shall pay for all living costs as defined above in (d), without right of contribution from Brooke. In such event, upon Brooke's death, she shall leave her interest in the residence (or in any remaining sales proceeds from the sale of the house if it has been sold) to Grant's children, in equal parts."  Paragraph 7(f) further provided that "[i]f there is an encumbrance on the residence at any time, for any reason, Grant shall make the necessary arrangements through mortgage insurance, his estate plan, or otherwise, to ensure that any and all obligations against or associated with the residence are fully paid at the time of his death . . . .  In the event that Grant dies and there remains, for any reason(s), an encumbrance against the residence and Grant has not made the foregoing arrangements to provide for the full payment of same upon his death, Brooke shall have a lien against Grant's estate in an amount sufficient to promptly pay the full amount of such lien or encumbrance so as to ensure that Brooke receives the property free and clear of any such liens or encumbrances."

Paragraph 14 warranted "that (a) this Agreement was entered into voluntarily by such [*sic*] party with full knowledge of its scope and effect; (b) this Agreement was not unconscionable when it was executed by the parties; (c) prior to the execution of this Agreement, each party was provided full, fair and reasonable disclosure of the property and financial obligations of the other party . . .; (d) this Agreement was not procured by fraud, duress or overreaching; (e) each party has been represented by and relied exclusively on independent counsel of his or her own choosing and paid for with his or her own funds in the negotiation of this Agreement; (f) this Agreement has been explained fully to each of the parties as to its meaning and legal consequences by such party's independent legal counsel; and (g) each of the parties understands the terms of this Agreement and its legal consequences."

6

Paragraph 21 stated that the parties "agree and acknowledge that this Agreement was reviewed by each of the parties and their respective attorneys or representatives. . . ." A fax Tessler sent to Ginsberg on March 17, 2004 indicates that Tessler added the phrase "or representatives" to paragraph 21.

## III.    Marriage and Tinker's Estate Plan

Knapp and Tinker married on April 5, 2004. Tinker finalized the purchase of the Perugia property on or about May 14, 2004. Approximately one year later, on May 11, 2005, Tinker executed a grant deed transferring title on the Perugia property from himself to himself and Knapp, "husband and wife, as community property with right of survivorship." The deed was recorded on May 17, 2005.

### A.    *Second Amended Trust*

On December 22, 2004, while represented by attorney Frank Glabach, Tinker executed a "Second Amended and Restated Declaration of Trust of the Grant A. Tinker Trust" ("Second Amended Trust"), of which he was the current trustee. Knapp was not party to and did not execute the document. The Second Amended Trust acknowledged the existence of the PMA and provided that, if Knapp survived Tinker by 90 days, the trust was to pay "the total amount of the encumbrances" on the Perugia property, "including any mortgage, deed of trust, and any real property taxes due."

The Second Amended Trust also provided that the successor trustee—who was not Knapp—was to set aside $450,000 to cover the "property taxes, assessments, insurance, maintenance, and ordinary repairs" on the Perugia property, for three years, using no more than $150,000 per year. It further provided, "All decisions of the Trustee regarding payments under this subparagraph, if any, are within the Trustee's discretion and shall be final and incontestable by anyone."

7

B.    *Continued Discussions*

During the next few years, Knapp and Tinker continued to consult with their respective counsel regarding Tinker's trust and the Perugia property. Ginsberg billed Knapp for "Further review re trust, Telephone call to client" on January 11, 2007, and in late March 2007 billed her for reviewing the PMA and trust documents and engaging in phone and written correspondence with Glabach.

On March 30, 2007, Ginsberg sent a letter to Glabach and Tessler "to address the concerns raised with regard to the potential discrepancy between the understanding relative to the premarital agreement . . . and those certain estate planning documents prepared by Frank [Glabach] and provided to the parties for review in December 2006."  In the letter, Ginsberg asserted that the proposed documents, which are not in the record, were "not compatible with the terms of the Premarital Agreement or the intent set forth therein," because they limited Knapp's interest in the Perugia property if Tinker predeceased her and "vest[ed] discretion and control in the person of any trustee of Grant's revocable trust with regard to the allocation of funds (and, in fact, sets a limit of $450,000) for the 3-year period for the payment of expenses on the residence following Grant's death."  Ginsberg emailed Knapp on April 25, 2007 to tell her that neither Glabach nor Tessler had responded to his March 30, 2007 letter.

According to a "memorandum to file" dated March 27, 2008, Glabach had prepared a "Residence Trust" for Tinker and Knapp, but Tinker told Glabach he wanted the Perugia property "to pass to Brooke outright if he should predecease her."  Glabach noted that he had advised Tinker that without a "Residence Trust," "Brooke would be free to transfer the Residence to persons other than his children during her remaining lifetime or upon her death, and he said he was ok with that, and the house was hers to do with it as she saw fit."

8

On January 30, 2010, Ginsberg emailed Knapp to follow up on their "[l]ong ago and far away" discussion regarding "the payment on the loan on the house in the event of death."  He sent another email on May 14, 2010, in which he referred to "new documents" and expressed concern "that Grant may be taking steps in contravention of the terms of the prenuptial agreement (whether or not he is aware of it), and we may need to take steps to intervene and seek correction."  Three days later, on May 17, 2010, Glabach sent an email to Tessler in which he noted that the PMA "left open alot [*sic*] of unresolved issues with respect to the residence" and expressed concern about a "significant risk that Grant's children will never receive any interest in the residence."

On June 16, 2010, Ginsberg emailed Knapp, summarizing a "lengthy conversation with Frank Glabach" regarding the disposition of the Perugia property in the event of Tinker's death.  Ginsberg emailed Knapp again on November 21, 2010, informing her that he had "never heard back from anyone with regard to the trust issues" and had "let the proverbial 'sleeping dogs lie.'"  Knapp responded that she preferred to leave the issue alone.

C.     *Fifth Amended Trust and Residence Trust*

On April 29, 2015, 11 years after the PMA was signed and five years after the flurry of discussion regarding trust documents and the Perugia property, Tinker again amended his trust with the aid of attorney Glabach ("Fifth Amended Trust").[2]  The Fifth Amended Trust stated that the PMA required Tinker's estate to pay off any

---

[2] Per the Fifth Amended Trust, the Second Amended Trust "was amended on December 14, 2006, further amended on March 19, 2008, further amended on December 4, 2012, and further amended on January 20, 2014."  The briefing does not discuss and the appellate record does not contain any of these amendments.

9

encumbrances on the Perugia property at the time of his death. It further stated that the PMA required Tinker's estate to pay all costs associated with the Perugia property for three years after his death, and, like the Second Amended Trust, earmarked $450,000 for the purpose of doing so. Unlike the Second Amended Trust, the Fifth Amended Trust provided that the $450,000 was to be placed in a newly created "Residence Trust," to be administered by a trustee other than Knapp. Knapp was not named as a trustee of the Fifth Amended Trust and did not sign the document.

The Residence Trust was executed concurrently with the Fifth Amended Trust. It quoted Paragraph 7(e) of the PMA and further provided: "In connection with the creation of this trust, the settlor intends to convey his one-half (1/2) community property interest in such residence to this trust and such property shall retain its character as community property in the trust. The settlor has created this trust to implement the provisions of Section 7 of the Premarital Agreement with respect to the disposition of the settlor's one-half community property interest in such residence . . . upon his death and it shall be interpreted consistently therewith. However, in the event of any conflict between the provisions of the Premarital Agreement and this trust instrument with respect to the disposition of the Residence upon his death, this trust instrument shall prevail." Tinker executed a grant deed transferring his interest in the Perugia property to the Residence Trust.

The Residence Trust further stated that it was "the settlors' [*sic*] intent that the settlor's wife own the equivalent of a 'life estate' interest in the Residence." It required Knapp to amend her own estate plan to provide that her "undivided one-half interest" in the Perugia property would go to Tinker's children in equal shares upon her death. If Knapp sold the Perugia property, and did not reinvest the full proceeds in a

replacement residence, she was required to leave the surplus proceeds to Tinker's children as well.  The Residence Trust conditioned the payment of costs associated with the Perugia property on Knapp making the changes to her estate plan, and capped the amount of the payments at $450,000.

D.    *Sixth Amended Trust*

Knapp learned of the Fifth Amended Trust and Residence Trust in May 2015, when Tinker received a copy of the grant deed in the mail and asked Knapp to explain it to him.  Knapp contacted Ginsberg "for his help with the matter" and arranged for Tinker to meet with a different attorney "to fix the situation."

Ginsberg contacted Glabach, who sent an email stating that although the PMA "requires the trustee to satisfy the mortgage on Grant's death[,] it does not appear that Grant's estate will have sufficient assets to do so."  Glabach proposed to Ginsberg that Knapp and Tinker sign a postmarital agreement requiring the sale of the Perugia property when one of them died, "and split the net proceeds in complete satisfaction of all of Brooks' [*sic*] claims under the Prenup."  Knapp and Tinker instead agreed to "undo" the most recent grant deed by recording a new deed restoring the Perugia property to community property with the right of survivorship.  The new deed was executed on June 8, 2015.

On July 15, 2015, Tinker revoked the Residence Trust.  He also executed the sixth and final amendment to his primary trust ("Sixth Amended Trust").  The Sixth Amended Trust did not mention the PMA, and it retained the $450,000 limit on the payment of expenses associated with the Perugia property after Tinker's death.  However, it named Knapp as co-trustee with Tinker's son Mark, and further provided that the trust responsible for paying the Perugia property expenses would terminate on the third anniversary of Tinker's death,

11

at which point all of the trust property would be distributed to Knapp or her estate "outright."

## IV.    Tinker's Death and Ensuing Litigation

### A.    *Tinker's Death and Sale of the Perugia Property*

Tinker died of natural causes, including dementia, on November 28, 2016.  Shortly after Tinker's death, Knapp learned that his estate lacked the funds to pay off the mortgage on the Perugia property. Knapp sold the Perugia property in February 2017 for approximately $10.2 million, and used the proceeds of the sale to pay off the approximately $3.9 million mortgage.  She put the remaining proceeds into a newly created trust, the Sunshine Trust, and used some of the proceeds to purchase and refurbish a new home.

### B.    *Undue Influence Petitions*

On July 24, 2017, three of Tinker's children, "the probate petitioners," filed a probate petition to set aside the Sixth Amended Trust.  They alleged that "Brooke procured the Sixth Amendment by undue influence."  On October 9, 2017, the probate petitioners filed a petition to set aside Tinker's revocation of the Residence Trust and the June 8, 2015 grant deed removing the Perugia property from the Residence Trust and returning it to Knapp and Tinker as community property, both of which they alleged were procured by Knapp's undue influence.  They further alleged that Knapp committed financial elder abuse.  Before their counsel filed these petitions, he reviewed the PMA, questioned its validity based on Tinker's signature and lack of attorney signing on his behalf, and flagged the issues for further investigation. However, neither petition alleged that the PMA was invalid.

### C.    *Creditor's Claim and Breach of Contract Suit*

On November 28, 2017, Knapp filed a creditor's claim against Tinker's estate.  Citing the PMA, she sought $3,993,468.32 as reimbursement for the amount she paid to satisfy the mortgage on the

12

Perugia property. After the estate failed to respond within 30 days, the claim was deemed rejected under Probate Code section 9256. On June 18, 2018, Knapp filed a complaint for breach of contract against Tinker's son Mark in his capacity as executor of Tinker's estate. She alleged that Mark breached the PMA by failing to reimburse her for the $3,993,468.32.

D.    *Tolling Agreement*

The parties undertook extensive discovery during their litigation of Knapp's and the probate petitioners' claims; both Tessler and Glabach were deposed. Tessler confirmed during his deposition that he was not an attorney, and Glabach testified that he was not involved in preparing the PMA.[3]

Knapp became concerned about the validity of the PMA and approached Ginsberg about tolling any potential malpractice claims. Knapp and Ginsberg entered into a tolling agreement on October 11, 2018. The tolling agreement stated that "between approximately March 10 and March 25, 2004, Ginsberg represented Knapp in the negotiation of the Premarital Agreement with Tinker and his business manager, Sidney Tessler," and that "following the execution of the Premarital Agreement" on March 25, 2004, "Ginsberg continued to represent Knapp in her dealings with Tinker, Tessler, and Tinker's counsel, Frank Glabach." It further stated that Knapp had initiated a probate action to enforce her rights under the PMA, and that the adverse parties in that action "have recently suggested through their

---

[3] The sole objection the trial court sustained in the summary judgment ruling was to an assertion in Knapp's declaration stating, "That fact was later reaffirmed at the August 29, 2018 deposition of Frank Glabach, who testified that he had no involvement in the preparation of the agreement." The probate petitioners' lawyer, David Pawlowski, gave similar testimony during his deposition in the instant matter.

13

discovery and deposition questions that they may challenge the enforceability of the Premarital Agreement." Ginsberg "denie[d] any wrongdoing, negligence or breach of any other duties owed to Knapp," but agreed to "toll the running of any statute of limitations applicable," as well as periods of "repose and laches applicable to any claims or defense, whether legal or equitable, that Knapp may have against Ginsberg, or that Ginsberg may have against Knapp, arising out of or related to Ginsberg's representation of Knapp" until the agreement's termination on April 30, 2019.

E.     *Settlement*

Knapp, Mark, and the probate petitioners reached a global settlement of their claims against one another on October 19, 2018 and executed a settlement agreement in December 2018. The settlement agreement provided for gifts to be made to various individuals from Tinker's trust, including $50,000 to each of his four children; the bequests were significantly less than those set forth in the trust documents. The settlement agreement further provided that the trust would pay approximately $300,000 in attorneys' fees to the probate petitioners' and Mark's counsel, and $127,367.55 to Knapp's counsel. After payment of any taxes, the remainder of the trust "shall be distributed to Brooke outright, to do with as she wishes."

The settlement agreement required Knapp to "amend the Sunshine Trust to (a) make it irrevocable, (b) confirm that all assets of that trust shall pass to lineal heirs of Grant upon Brooke's death[,] (c) clarify that Brooke's life estate applies to the [residence she purchased with the Perugia property proceeds], as well as any successor or replacement residence, (d) clarify that Brooke has the right to use the income and, if necessary, the principal, of the trust for her living expenses, including property taxes, utilities, car leases, gas, food and travel, irrespective of her other resources, (e) establish that the net

14

asset value of the Sunshine Trust will be no less than $2 million at Brooke's death, and (f) establish that at least $2 million of the Sunshine Trust shall be distributed in four equal parts to Mark and [the probate petitioners], or their heirs or [ ]assignees. . . through the creation of a separate irrevocable trust that will hold a $2 million security interest in [Knapp's current residence], any successor personal residence, or equivalent assets."

None of the parties admitted any fault or liability in the settlement agreement, and they released all claims they had against one another.  Knapp expressly retained "any claims she may have against her former attorney, Larry Ginsberg, the law firm of Harris Ginsberg, Frank Glabach, the law firm of Thompson Coburn, LLP, or Sidney Tessler."

## V.     The Instant Malpractice Action

### A.     *Complaint and Answer*

On April 2, 2019, Knapp filed a malpractice action against Ginsberg.  She alleged that she retained Ginsberg in or about February 2004 "to provide her with advice regarding her planned marriage and to assist her with the negotiation of a premarital agreement with Grant."  She further alleged that Ginsberg negotiated the PMA with Tessler for approximately one month before she and Tinker executed the PMA and Ginsberg and Tessler approved it as to form.  "On information and belief," she alleged that Tinker "was not represented by any attorney in the negotiation of the Prenuptial [*sic*] Agreement," but "never signed the separate waiver of independent counsel that is required by Family Code section 1615 ('Section 1615'). Under the terms of Section 1615, this made the Premarital Agreement unenforceable."

Knapp alleged that Tinker's estate had a value of approximately $2.9 million at the time of Tinker's death in November 2016. The mortgage on the Perugia property exceeded $3.9 million at that time.

15

She further alleged that the Perugia property "became [her] property by operation of law, subject to the Mortgage," and that she sold the property and paid off the mortgage in February 2017. In November 2017, she filed a creditor's claim against Tinker's estate for the approximately $3.9 million she spent on the mortgage, "[c]onsistent with her right under the Premarital Agreement to have received the Perugia Residence free and clear of any encumbrance." The probate petitioners then filed petitions to "invalidate certain changes that Grant made to his estate plan during the last years of his life." Knapp alleged that she incurred approximately $500,000 in attorneys' fees while litigating her claim and the probate petitioners' claims against her.

Knapp alleged that she entered into a settlement agreement with Tinker's children in December 2018, "under which she agreed that the following payments would be made from Grant's estate before the remainder was paid to her under the Premarital Agreement: (i) $511,666.67 to the beneficiaries named in Grant's trust other than his children; (ii) $50,000 to each of Grant's four children; and (iii) $300,000 for reimbursement of attorneys' fees incurred by Grant's children. In addition, [Knapp] agreed to leave at least $2 million of her estate to Grant's heirs, and to create a separate trust to hold $2 million in trust for those beneficiaries." She alleged that Ginsberg's malpractice, namely his "failure to obtain a separate signed waiver from Grant of his right to independent counsel, as required by Section 1615," thus proximately caused her damages "including but not limited to the $111,666.67 [*sic*] that she was forced to allow Grant's estate to pay to parties other than herself, the approximately $500,000 in attorneys' fees that she incurred in litigating the amounts that should have been paid to her under the Premarital Agreement, and the present value of

16

the loss of transferability of $2 million of her estate at the time of [her] death."

Ginsberg answered the complaint on April 18, 2019. He filed an amended answer on April 29, 2019. In the amended answer, Ginsberg denied the allegations of the complaint and further denied that Knapp was injured or damaged. He further denied that he was "negligent, careless, reckless, wanton, or [was] liable whether in the manner alleged or otherwise." Ginsberg asserted fourteen affirmative defenses, including the statute of limitations, lack of proximate cause, and Knapp's ratification and affirmation of all conduct.

B. *Summary Judgment Proceedings*

1. *Motion for Summary Judgment*

Ginsberg moved for summary judgment on January 21, 2020 on two grounds: "The Complaint is barred by the statute of limitations," and "There is no causal connection to any damages alleged." On the statute of limitations ground, Ginsberg argued that Knapp's claim was untimely under Code of Civil Procedure section 340.6, which requires plaintiffs to commence malpractice actions against attorneys "within one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the facts constituting the wrongful act or omission, or four years from the date of the wrongful act or omission, whichever occurs first." He argued that the alleged negligent act was his failure to obtain a waiver of independent counsel from Tinker in March 2004, "well beyond the four-year period established in Section 340.6." Ginsberg further argued that the claims were not tolled, because Knapp incurred the alleged damages in February 2017, "when she sold the Perugia property within months of Grant's death and paid the mortgage in full, at the latest." Ginsberg also contended that he did not represent Knapp beyond March 2004, outside of a "short-lived" retention related to real estate in 2015.

17

On the alternative ground, Ginsberg argued that Knapp was unable to prove causation and damages "either factually or legally," for four reasons. First, he contended that section 1615 was not applicable, because "neither party took a position the [PMA] was unenforceable." Ginsberg asserted that the only parties with the right to enforce the PMA were Knapp and Tinker; neither Tinker nor the executor of his estate took the position that the PMA was unenforceable; and Knapp argued that the PMA was enforceable in her claim against the estate. Thus, he contended, "neither party to the Agreement ever took a position that it was unenforceable and therefore Section 1615 has no applicability."

Second, Ginsberg contended that Knapp had no evidence that Tinker was not represented by counsel when he signed the PMA. He pointed to Knapp's deposition testimony stating that Tinker never told her he was or was not advised by an attorney in connection with the PMA, and to the warranty in the PMA stating that "each party has been represented by and has relied exclusively on independent counsel of his or her own choosing and paid for with his or her own funds in the negotiation of this Agreement." In light of this evidence, Ginsberg asserted, "section 1615 has no applicability whatsoever, and there is no causal connection to any damages as claimed in the Complaint."

Third, Ginsberg argued that Tinker "ratified the terms of the Premarital Agreement on multiple occasions." Ginsberg contended that section 1615 renders a PMA signed without independent counsel involuntary, and that Civil Code section 1588 provides that contracts "voidable solely for want of due consent, may be ratified by a subsequent consent." Therefore, even if Tinker failed to comply with section 1615, his subsequent references to the PMA in the Second Amended Trust, the Fifth Amended Trust, and Sixth Amended Trust ratified the PMA and "cured his purported lack of consent on multiple

18

occasions.  As such there is no causal connection to any damages alleged against these defendants."

Finally, Ginsberg contended that the $500,000 in attorneys' fees Knapp sought as damages were connected to the probate petitioners' claims against her, not any alleged malpractice.  He further asserted that those claims were of independent origin, such that they were not causally connected to the alleged malpractice.

2.    *Opposition*

Knapp opposed the summary judgment motion.  First, she contended that her claim was not barred by the statute of limitations.  She argued that the limitations period under Code of Civil Procedure section 340.6 was tolled while Ginsberg continued to represent her and until she sustained actual damages.  She asserted that she reasonably believed Ginsberg represented her for all purposes, and that Ginsberg in fact represented her in connection with alleged ambiguities in the PMA in March 2007, May and June 2010, and in June 2015. She filed her claim within four years of June 2015, rendering it timely.  Knapp also argued that she first learned of the alleged malpractice during litigation discovery in February 2018, at which point she promptly entered into a tolling agreement with Ginsberg; she asserted that she filed the action before the tolling agreement expired.  She further contended that Ginsberg conceded that she "did not suffer damages until February 2017," when she sold the Perugia property, and that her action was filed within four years of that date.

Knapp also challenged Ginsberg's contention that his alleged negligence did not proximately cause her damages.  Emphasizing that causation in malpractice cases is normally a fact issue for the jury, she contended there was a triable issue of fact as to whether Ginsberg's alleged malpractice caused her damages.  She first asserted that causation was established or at least posed a triable question of fact

19

because "the controlling statute made this particular type of agreement invalid if an unrepresented party did not waive his right to counsel in a separate document," and Ginsberg knew or should have known about the waiver requirement yet failed to satisfy it. Next, she contended that whether the estate and the probate petitioners challenged the validity of the PMA presented a triable issue of material fact. She conceded that the petitions did not challenge the PMA, but asserted that petitioners pursued the issue "aggressively in the litigation and related settlement negotiations" after Tessler and Glabach were deposed. Knapp dismissed as "ludicrous" Ginsberg's contention that there was no evidence that Tinker was not represented by counsel in connection with the PMA.

Knapp also disputed Ginsberg's contention that Tinker ratified the PMA. She asserted that the trust amendments were prepared in an effort to modify the terms of the PMA, and that she did not approve or execute any of them. She further argued that "any ratification of the premarital agreement would have to specifically acknowledge the defect relating to the waiver of advice of counsel," and that, "at a minimum," the question of ratification was a factual issue for a jury. Finally, Knapp urged the court to disregard Ginsberg's argument about her attorneys' fees, "as it is not dispositive of the action, but only addresses an element of damages."

3.    *Reply*

In his written reply, Ginsberg contended that Knapp failed to meet her burden of showing a triable issue of material fact. With respect to the statute of limitations, Ginsberg argued that the action was not tolled by continued representation, the evidence of which he claimed consisted only of Knapp's "self-serving Declaration." He also argued that the action was not tolled by lack of damages, because Knapp "does not deny that damages were incurred by *no later than*

20

February 2017," when she paid off the mortgage, and that was more than a year earlier than she filed suit. With respect to causation and damages, Ginsberg contended that "[n]o admissible evidence has been presented establishing that Mr. Tinker was not consulting with independent counsel in March 2004."[4] He also emphasized that the PMA contained a warranty that "disposes of the entire premise on which this action was filed," while none of the "documentary evidence, including the Petitions filed by the adult children," contained allegations that the PMA was unenforceable. Ginsberg further asserted, in a single sentence, that Tinker's children lacked standing to challenge the enforceability of the PMA in any event.

Ginsberg also reiterated his contentions that Tinker ratified the PMA, and that various events including the probate petitioners' petitions were intervening and superseding causes of Knapp's alleged damages. Ginsberg asserted that his evidence of ratification was unrefuted, that Tinker was represented by counsel when he signed the Second Amended Trust, Fifth Amended Trust, and Sixth Amended Trust, and that Knapp "ignores this in her opposition with a passing paragraph of nothing more than argument."

4. *Tentative Ruling*

In advance of the hearing on the motion, the court issued a tentative ruling granting summary judgment on the sole ground that causation could not be established because Tinker ratified the PMA in his trust amendments. The court stated that it found persuasive Ginsberg's evidence and contention that Tinker repeatedly acknowledged the existence and terms of the PMA and failed to rescind it. Citing Civil Code section 1588 and case law in which non-marital contracts were ratified, the court found that Tinker's execution of the

_____

[4]As previously noted, Ginsberg objected to much of the evidence Knapp submitted in opposition to the motion for summary judgment.

21

Second and Fifth Amended Trusts specifically acknowledged the PMA, that the Fifth Amended Trust "specifically referenced his intent to satisfy the requirements" of the PMA, and that any lack of consent in the PMA "was ratified" by these amendments. "As such," the court concluded, Knapp "cannot demonstrate that it is likely that she would have obtained a better settlement but for the alleged legal malpractice." The court rejected as unpersuasive and unsupported Knapp's assertion that the Second and Fifth Amended Trusts were in fact attempts to modify the terms of the PMA.

The court rejected Ginsberg's other arguments relating to causation. It found that Ginsberg's authorities on the probate petitioners' lack of standing were not persuasive, that his argument regarding Knapp's attorneys' fees "ignores the actual damages suffered by Plaintiff in settling with Grant's children due to their threat of challenging the Premarital Agreement as unenforceable," and that he failed to show that Knapp could not reasonably obtain evidence that Tinker was not represented by counsel when he signed the PMA.

The court also concluded that Ginsberg did not meet "the initial burden of demonstrating that the sole legal malpractice cause of action is barred by the statute of limitations." The court concluded that the four-year statute of limitations expired on March 25, 2008, four years after the PMA was executed, but that the statute was tolled until Knapp suffered actual injury as a result of the alleged malpractice. The court found that Ginsberg failed to provide any evidence that Knapp was injured when Tinker signed the PMA, and that, to the contrary, Ginsberg's evidence showed that no one asserted in court proceedings that the PMA was unenforceable. The court noted that, if Knapp's evidence were considered, it showed that she first suffered actual damage on October 19, 2018, when she entered into the settlement agreement.

22

### 5.    *Hearing and Ruling*

At the June 26, 2020 hearing on the motion, Knapp's counsel argued that the Second and Fifth Amended Trusts did not expressly incorporate or ratify the PMA and instead attempted to undo portions of the PMA. He further argued that whether Tinker ratified the PMA was a question of fact, and that a factfinder would have to find that Tinker knew about the defect to find ratification. Counsel also argued that public policy precluded ratification of premarital agreements that section 1615 deemed involuntary, because the legislature determined that people without lawyers need to be given extra protection when they sign premarital agreements.

Ginsberg's counsel argued that the PMA was voidable, not void, and that Tinker ratified it "multiple times." She further argued that Tinker did not have to be aware of the defect to effectively ratify the PMA, and that his other conduct, such as recording a deed to the Perugia property with Knapp's name on it, also constituted ratification. Moreover, counsel contended, Tinker never attempted to rescind the PMA. Counsel also argued that Tinker's children lacked standing to challenge the PMA.

In reply, Knapp's counsel asserted that he had been present when the mediator told the parties that he believed the PMA was void under section 1615. Ginsberg's counsel objected, citing the mediation privilege, Knapp's counsel stated that the parties had waived the privilege, and Ginsberg's counsel disputed that assertion. Knapp's counsel then pointed to other evidence in the record supporting the claim that the PMA was invalid, including attorney Pawlowski's deposition testimony. He also argued that Tinker's children had standing to challenge the PMA, because they were either the personal representative (Mark) or interested parties (the probate petitioners).

23

The court took the matter under submission. Approximately one week later, it issued a ruling substantively identical to the tentative.[5] The court entered judgment against Knapp and for Ginsberg on August 5, 2020.

Knapp timely appealed.

## DISCUSSION

On appeal, Knapp contends that the trial court erred in granting summary judgment for four reasons. First, she contends that Ginsberg failed to properly raise the affirmative defense of ratification in his answer and therefore was barred from raising it at summary judgment. Next, she argues that the PMA was void and therefore incapable of ratification as a matter of law; she has filed a request for judicial notice of the legislative history of section 1615 in support of this argument. Third, Knapp argues that if the PMA is capable of ratification, either Tinker did not ratify it, or there is a triable issue of fact as to whether Tinker ratified it. Finally, she contends that the trial court's ruling

---

[5]Knapp contends there was one "key variance." In the tentative, the court stated, "Here, Family Code § 1615 *would render the premarital agreement unenforceable—if at all—were there* a showing that the party against whom enforcement is sought did not execute the agreement voluntarily [Family Code § 1615(a)(1)], which involuntariness is presumed per Family Code § 1615(c), unless a court makes the findings set forth in Family Code § 1615(c)(1) – (5)." In the final ruling, the court stated, "Here, Family Code § 1615 *could render the premarital agreement unenforceable upon* a showing that the party against whom enforcement is sought did not execute the agreement voluntarily (and involuntariness is presumed per Family Code § 1615(c)), unless a court makes the findings set forth in Family Code § 1615(c)(1) – (5)." Knapp claims the court "accurately summarized § 1615 in the Tentative Ruling" but "rewrote the statute in the Order." We are not persuaded that the change in wording materially affected the ruling or differently construed the statute in any way.

24

cannot be affirmed on any other grounds argued in the summary judgment motion, because Tinker's estate had standing to challenge the PMA, she timely filed suit, and Ginsberg failed to prove Tinker was represented by counsel.

Ginsberg responds that summary judgment was properly granted. He first asserts that he did not need to plead ratification because he is not using it as an affirmative defense. Next, he contends that Knapp waived her primary argument that the PMA was void rather than voidable by failing to appropriately assert it below, and that her request for judicial notice should be denied for the same reason. Next, he argues that even if she did not waive the argument, it lacks merit because the PMA was merely voidable and Tinker ratified it. Finally, he contends that we may affirm on the alternative grounds that Tinker's children lacked standing to challenge the PMA, the admissible evidence shows Tinker consulted with counsel, and the action is barred by the statute of limitations.

Addressing these contentions in a slightly different order to reflect the threshold nature of whether Tinker consulted with counsel, we conclude that summary judgment was improperly granted and reverse. We first conclude that, contrary to Ginsberg's contention, the evidence does not establish that Tinker was represented by counsel; that is a triable issue of material fact. We next consider Knapp's argument regarding the nature of the PMA, which was raised if not well developed below, and conclude that premarital agreements that do not comply with section 1615 are void, not voidable, and therefore cannot be ratified as a matter of law. The trial court accordingly erred in granting summary judgment on the basis of Tinker's ratification. We reject Ginsberg's argument that summary judgment was warranted on the other bases asserted in the summary judgment motion.

25

# I. Governing Principles

## A. *Standard of Review*

Summary judgment is appropriate "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) To prevail on a summary judgment motion, the moving defendant has the initial burden to show that a cause of action lacks merit because an element of the claim cannot be established or there is a complete defense. (*Id.* at subd. (p)(2).) To satisfy this burden, the defendant must present evidence which either negates an element of the plaintiff's cause of action or show that the plaintiff does not possess, and cannot reasonably obtain, needed evidence. (*Aguilar*, *supra*, 25 Cal.4th at p. 855.) Once the defendant has made the requisite showing, the burden shifts to the plaintiff to set forth specific facts showing that a triable issue of material fact exists. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476-477.)

We review the trial court's decision de novo, considering all the evidence presented by the parties, except evidence properly excluded by the trial court, and the uncontradicted inferences reasonably supported by the evidence. (*Merrill v. Navegar, Inc.*, *supra*, 26 Cal.4th at p. 476; see also *Reid v. Google, Inc.*, *supra*, 50 Cal.4th at pp. 534-535.) We view the evidence in the light most favorable to the plaintiff, liberally construing the plaintiff's submissions while strictly scrutinizing the defendant's showing, and resolving any evidentiary doubts or ambiguities in the plaintiff's favor. (*Aguilar*, *supra*, 25 Cal.4th at p. 843; *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037.)

## B. *Legal Malpractice*

The elements of a cause of action for legal malpractice are "(1) the duty of the attorney to use such skill, prudence, and diligence as members of his or her profession commonly possess and exercise; (2) a

breach of that duty; (3) a proximate causal connection between the breach and the resulting injury; and (4) actual loss or damage resulting from the attorney's negligence." (*Coscia v. McKenna & Cuneo* (2001) 25 Cal.4th 1194, 1199.) A plaintiff must prove all four elements to prevail; failure to prove even one is fatal to recovery. (*Namikas v. Miller* (2014) 225 Cal.App.4th 1574, 1582 (*Namikas*).)

"'In the legal malpractice context, the elements of causation and damage are particularly closely linked.'" (*Namikas, supra*, 225 Cal.App.4th at p. 1582.) "The plaintiff must prove, by a preponderance of the evidence, that but for the attorney's negligent acts or omissions, he [or she] would have obtained a more favorable judgment or settlement in the action in which the malpractice allegedly occurred." (*Ibid.*; *Viner v. Sweet* (2003) 30 Cal.4th 1232, 1241; accord, *Masellis v. Law Office of Leslie F. Jensen* (2020) 50 Cal.App.5th 1077, 1091 (*Masellis*).) "'If the allegedly negligent conduct does not cause damage, it generates no cause of action in tort. The mere breach of a professional duty, causing only nominal damages, speculative harm, or the threat of future harm—not yet realized—does not suffice to create a cause of action for negligence. [Citations.] Hence, until the client suffers appreciable harm as a consequence of [the] attorney's negligence, the client cannot establish a cause of action for malpractice.'" (*Jordache Enterprises, Inc. v. Brobeck, Phlegar & Harrison* (1998) 18 Cal.4th 739, 749-750, quoting *Budd v. Nixen* (1971) 6 Cal.3d 195, 200.) "In legal malpractice claims, the absence of causation may be decided on summary judgment 'only if, under undisputed facts, there is no room for a reasonable difference of opinion.' [Citation.]" (*Namikas, supra*, 225 Cal.App.4th at p. 1583.)

**II.    Analysis**

   A.    *Whether Tinker was represented by counsel presents a*
   *threshold triable issue of material fact.*

The version of section 1615 in effect at the time Knapp and Tinker executed the PMA[6] provided in relevant part that a premarital agreement "is not enforceable if the party against whom enforcement is sought proves . . . That party did not execute the agreement voluntarily."  (Former § 1615, subd. (a)(1).)  "For the purposes of subdivision (a), it shall be deemed that a premarital agreement was not executed voluntarily unless the court finds in writing or on the record all of the following:  [¶] (1) The party against whom enforcement is sought was represented by independent legal counsel at the time of the signing the agreement or, after being advised to seek independent legal counsel, expressly waived, in a separate writing, representation by independent legal counsel.  [¶] (2) The party against whom enforcement is sought had not less than seven calendar days between the time that party was first presented with the agreement and advised to seek independent legal counsel and the time the agreement was signed.  [¶] (3) The party against whom enforcement is sought, if unrepresented by legal counsel, was fully informed of the terms and basic effect of the agreement as well as the rights and obligations he or she was giving up by signing the agreement, and was proficient in the language in which the explanation of the party's rights was conducted and in which the agreement was written.  The explanation of the rights and obligations relinquished shall be memorialized in writing and delivered to the

_____

[6] Section 1615 was revised effective January 1, 2020.  The version of the statute in force at the time the parties executed the PMA governs.  (*In re Marriage of Melissa* (2012) 212 Cal.App.4th 598, 611-612; *In re Marriage of Hill & Dittmer* (2011) 202 Cal.App.4th 1046, 1057.).

party prior to signing the agreement.  The unrepresented party shall, on or before the signing of the premarital agreement, execute a document declaring that he or she received the information required by this paragraph and indicating who provided that information.  [¶](4) The agreement and the writings executed pursuant to paragraphs (1) and (3) were not executed under duress, fraud, or undue influence, and the parties did not lack capacity to enter into the agreement.  [¶] (5) Any other factors the court deems relevant."  (Former § 1615, subds. (c)(1)-(5).)

Ginsberg contends that Knapp cannot establish the causation element of her malpractice claim because undisputed evidence shows that Tinker was represented by counsel, rendering section 1615, subdivision (c)(1) inapplicable.[7]  Though this argument seems more pertinent to the element of breach—if Tinker were represented, the alleged breach of duty by Ginsberg could not have occurred—whether Tinker was represented is a threshold factual issue in this case. The complaint alleges that Tinker was not represented.  Ginsberg contends he met his burden as moving party at summary judgment "to negate Knapp's theory that Tinker was unrepresented and that a separate waiver was required where the undisputed terms of the Agreement state that Tinker was represented by independent counsel."  He further asserts that "it is undisputed that Tinker never told Knapp that he was not advised by an attorney prior to signing the Agreement," and "[n]o admissible evidence was presented that established that Tinker was not consulting with independent counsel in March 2004."

---

[7]He does not contend that Tinker signed the written waiver of counsel required of unrepresented parties, though the alleged "principal active malpractice consisted of [Ginsberg's] failure to obtain a separate signed waiver from Grant of his right to independent counsel, as required by Section 1615."

Ginsberg correctly observes that the PMA stated that "(e) each party has been represented by and relied exclusively on independent counsel of his or her own choosing and paid for with his or her own funds in the negotiation of this Agreement; (f) this Agreement has been explained fully to each of the parties as to its meaning and legal consequences by such party's independent legal counsel; and (g) each of the parties understands the terms of this Agreement and its legal consequences." We agree with Knapp, however, that the language in the PMA does not conclusively establish that Tinker was represented.

*In re Marriage of Clarke & Akel* (2018) 19 Cal.App.5th 914, (*Clarke*) is instructive. There, Matthew prepared an initial draft of a premarital agreement and sent it to his intended wife Claudia. (*Clarke, supra*, 19 Cal.App.5th at p. 917.) Matthew retained an attorney to represent Claudia in the negotiations but did not retain or consult with an attorney himself. (*Ibid.*) The attorney met with both parties to discuss the provisions, and privately advised Claudia during the meeting. The following day, the attorney sent an edited version of the premarital agreement to Matthew. The parties executed the agreement the day after that; Matthew also signed a separate written waiver of counsel. (*Id.* at p. 918.) During the parties' dissolution proceedings several years later, Claudia sought to enforce the premarital agreement against Matthew. (*Id.* at p. 919.) The trial court concluded the agreement was unenforceable under former section 1615, subdivision (c)(2), because Matthew did not receive the final version of the agreement at least seven days before its execution. Claudia appealed, and the court of appeal affirmed. (See *id.* at p. 922.)

As is relevant here, Claudia contended that "Matthew must be deemed to have had seven days to review the premarital agreement" because a provision within the agreement stated, "'Each of us acknowledges that he/she received this Agreement more than seven

30

days before executing it, and had ample time to review this Agreement with independent legal counsel and other professional advisors before signing it.'" (*Clarke, supra*, 19 Cal.App.5th at p. 920.) Claudia relied on Evidence Code section 622, which provides that "The facts recited in a written instrument are conclusively presumed to be true as between the parties thereto . . . ." (*Id.* at pp. 920-921.) The court of appeal rejected this contention, holding that Evidence Code section 622 "does not apply to situations not involving arm's length negotiations," including the premarital agreement at issue. (*Id.* at p. 921.) It reasoned that former section 1615, subdivision (c)(2) was "obviously designed to protect parties who enter into a premarital agreement without legal representation, and this policy would be thwarted if the rule could be satisfied by the inclusion of boilerplate language that did not reflect the true facts." (*Ibid.*)

The same is true of former section 1615, subdivision (c)(1). Whether the boilerplate language in the PMA stating that both parties were represented by counsel reflected reality remains an open question of fact that must be resolved by a factfinder. Both sides presented evidence on the issue; Ginsberg's assertion that Knapp's evidence was inadmissible does not preserve his evidentiary objections in this court or otherwise demonstrate the absence of a triable issue of material fact.

B.     *The court's ruling on ratification was in error.*

The trial court concluded that, even if the issue of Tinker's representation were resolved in Knapp's favor—i.e., he was not represented—summary judgment was warranted because Tinker ratified the PMA by acknowledging it in the Second Amended Trust and acknowledging it and clarifying his intent to satisfy its requirements in the Fifth Amended Trust. Knapp contends this ruling was in error, and we agree.

31

1.   *The issue of ratification was properly before the trial court.*

Knapp first contends that the summary judgment "should be summarily reversed" because Ginsberg did not assert ratification as an affirmative defense in his answer to her complaint.  We disagree.

"Ratification is, generally, an affirmative defense." (*Reina v. Erassaret* (1949) 90 Cal.App.2d 418, 424.) As such, it must be pleaded and proved by a defendant. (*Glaski v. Bank of America* (2013) 218 Cal.App.4th 1079, 1097 fn. 16.)  Knapp is correct that Ginsberg's amended answer does not assert Tinker's ratification of the PMA as an affirmative defense.

However, Knapp's sole claim is legal malpractice, and she has not cited any authority for the proposition that ratification is an affirmative defense to that cause of action.  Ratification can be used to imbue a voidable transaction with full legal force and effect (*Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 929-930), or to adopt as one's own an act purportedly performed by an agent on one's behalf.  (*City v. Brentwood v. Department of Finance* (2020) 54 Cal.App.5th 418, 437.)  Neither of those situations are at issue in a legal malpractice cause of action, the elements of which are duty, breach, causation, and damages.  (See *Coscia v. McKenna & Cuneo, supra*, 25 Cal.4th at p. 1199.)  Indeed, a leading treatise does not include ratification among the "particular defenses" that may be raised in the legal malpractice context.  (See Wiseman & Reese, Cal. Practice Guide: Civil Procedure Before Trial, Claims and Defenses (The Rutter Group 2020) ¶¶ 6:510-6:535.)

Here, Ginsberg moved for—and the court granted—summary judgment on the basis that Knapp was unable to establish an element of her claim, causation.  Ginsberg pled lack of causation as an affirmative defense.  He argued ratification only as one of several

32

reasons why causation was lacking. Knapp had an opportunity to respond to Ginsberg's arguments regarding causation, including ratification, both in her briefing and during the hearing. The court properly refused to grant summary judgment due to deficiencies in Ginsberg's pleading.

2.     *Knapp's argument is not waived.*

Ginsberg contends that Knapp waived any argument that premarital agreements that do not satisfy section 1615's waiver requirement are void and cannot be ratified by failing to present it below.[8]  He asserts that neither he nor the trial court had an "opportunity to address Knapp's newfound argument," and that "[f]airness and judicial economy dictate that Knapp has waived this argument on appeal."  We disagree.

In the summary judgment motion, Ginsberg argued that an involuntarily executed PMA was voidable, not unenforceable, and Tinker "cured his purported lack of consent on multiple occasions." In her written opposition, Knapp asserted that section 1615 "made this particular type of agreement invalid if an unrepresented party did not waive his right to counsel in a separate document."  During the hearing on the motion, her counsel argued that public policy precluded ratification of premarital agreements that section 1615 deemed involuntary.  Ginsberg and the trial court both had the opportunity to address these arguments.  Ginsberg's counsel argued at the hearing that the key questions for the court were whether the PMA was "void, or was it voidable?  Did Grant Tinker ratify the terms of the premarital agreement?"  The trial court evidently agreed, as its ruling turned on these very questions. As Ginsberg asserts, "fairness is at the heart of a waiver claim."  (*JRS Products, Inc. v. Matsushita Electric Corp. of*

---

[8]Here, Ginsberg mentions *only* the waiver requirement.

33

*America* (2004) 115 Cal.App.4th 168, 178.)  The record here does not evince any unfairness to Ginsberg and therefore does not support a finding of waiver.

Moreover, even if it did, "a Court of Appeal is at liberty to reject a waiver claim and consider the issue on the merits."  (*JRS Products, Inc. v. Matsushita Electric Corp of America*, *supra*, 115 Cal.App.4th at p. 179.)  This is particularly true where the new theory presents a question of law, or where important issues of public policy are at stake. (*In re Marriage of Hinds* (1988) 205 Cal.App.3d 1398, 1403; *In re Marriage of Moschetta* (1994) 25 Cal.App.4th 1218, 1227.)  Both of these concerns are present here.  We accordingly proceed to the merits.

> 3.  *A PMA that is involuntarily executed cannot be ratified.*

Section 1615 states that a premarital agreement "is not enforceable if the party against whom enforcement is sought proves . . . That party did not execute the agreement voluntarily." (§ 1615, subd. (a)(1).)  When we construe statutory language such as this, our fundamental task is to determine the intent of the lawmakers and effectuate the intended purpose of the statute.  (*In re Marriage of Cadwell-Faso & Faso* (2011) 191 Cal.App.4th 945, 957.)  We begin with the language of the statute, giving every word its usual and ordinary meaning and garnering intent from the statute as a whole.  (*Ibid.*)  If the terms of the statute are clear and unambiguous, our inquiry ends. If not, we may then look to extrinsic sources, including the legislative history, to ascertain the Legislature's intent.  (*Ibid.*)  "[I]f neither the words of the statute nor its history expose a clear meaning, 'we apply reason and practicality, and interpret the statute in accord with common sense and justice, and to avoid an absurd result.'  [Citation.]" (*Ibid.*)

34

Here, the plain language of section 1615 states that a premarital agreement is not enforceable if the party against whom enforcement is sought did not execute the agreement voluntarily.  Knapp asserts that "is not enforceable" means what it says: the agreement is void and cannot be enforced.  She relies on the dictionary definition of "enforceable," as well as the mandatory language "shall be deemed" elsewhere in the statute.  Ginsberg focuses on the phrase "against whom enforcement is sought," which he argues renders the agreement voidable; he cites several contracts cases and the Restatement (Second) of Contracts in support.  Neither side points to any case law construing section 1615 or the particular language it uses.

One of the few cases to have construed section 1615 is *Clarke*, *supra*, 19 Cal.App.5th 914, the facts of which we summarized above. There, the court concluded that "Family Code section 1615, subdivision (c)(2), provides that a premarital agreement is involuntary, and thus invalid, when an unrepresented party has had fewer than seven days to review the agreement." (*Clarke*, *supra*, 19 Cal.App.5th at p. 921.)  The court did not conclude the agreement was unenforceable only as to husband Matthew but enforceable against wife Claudia; it found that the agreement as a whole was not valid.  Indeed, the court rejected Claudia's suggestion that it "should have only invalidated the provisions that were added [belatedly] by [Claudia's attorney] and enforced the remainder of the premarital agreement, which Matthew himself drafted." (*Ibid.*)  The court explained, "Family Code section 1615 renders 'a premarital agreement' unenforceable against a party who did not execute the agreement voluntarily, and further provides that an agreement is not voluntarily executed unless certain predicates have been established.  (Fam. Code, § 1615, subds. (a), (c).)  Given the plain language of the statute, we are not at liberty to selectively enforce

portions of an agreement when any of those predicates are lacking." (*Ibid.*)

"'Not valid' does not necessarily mean 'void.'" (*Safarian v. Govgassian* (2020) 47 Cal.App.5th 1053, 1067.) Yet, as Knapp points out, construing "not enforceable" to mean "voidable" would essentially render the separate waiver portion of the statute superfluous: "If § 1615 were interpreted so that a party who was required (and failed) to sign a Separate Waiver could enforce a premarital agreement anyway, it would impermissibly read the Separate Waiver requirement out of the statute." We aim to avoid constructions that render portions of a statute superfluous. (*In re Marriage of Turkanis & Price* (2013) 213 Cal.App.4th 332, 351.)

We also aim to construe an ambiguous statute such as this one in accordance with its legislative history. Knapp has requested that we take judicial notice of the legislative history of section 1615. Ginsberg opposes the request on the grounds that Knapp failed to demonstrate exceptional circumstances for requesting judicial notice in this court in the first instance and further failed to properly authenticate the documents. We deny the request as moot. Although committee reports and analyses or digests of the Legislative Counsel are relevant, a request for judicial notice of these published materials is unnecessary. (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 45, fn. 9.) "Citation to the material is sufficient." (*Ibid.*) We accordingly consider the request for judicial notice as a citation to those materials that are published, including legislative committee reports. (*Ibid.*)

The legislative history supports Knapp's construction. The bill that added section 1615, subdivision (c)(1) also added Family Code section 1612, subdivision (c) ("section 1612, subdivision (c)"), which provides in relevant part: "Any provision in a premarital agreement regarding spousal support, including, but not limited to, a waiver of it,

is not enforceable if the party against whom enforcement of the spousal support provision is sought was not represented by independent counsel at the time the agreement containing the provision is signed, or if the provision regarding spousal support is unconscionable at the time of enforcement."  The language of section 1612, subdivision (c)—"is not enforceable if the party against whom enforcement of the spousal support provision is sought"—is virtually identical to that in section 1615, subdivision (c)(1).  And the legislative history discussing section 1612, subdivision (c) explicitly states that its author "intends with this bill to legislatively confirm that waivers of spousal support *are void as against public policy*."  (Sen. Rules Com., Off. Of Sen. Floor Analyses, analysis of Sen. Bill No. 78 (2001-2002 Reg. Sess.), May 1, 2001, pp. 3-4, emphasis added.)  "We must construe identical words in different parts of the same act or in different statutes relating to the same subject matter as having the same meaning."  (*Balasubramanian v. San Diego Community College Dist.* (2000) 80 Cal.App.4th 977, 988.)  Ginsberg contends that we should not, because "Section 1612 has stricter requirements than section 1615," and the legislative history does not include a similar comment pertaining to section 1615.  Regardless of its breadth, however, section 1612 uses the same language as section 1615; we decline Ginsberg's invitation to disregard this similarity.

We likewise are not persuaded by Ginsberg's contention that the public policy reasons for enacting section 1615, subdivision (c) are "not in jeopardy" here because Tinker "was the higher-earning spouse and undoubtedly it was Knapp that needed the protections of section 1615."  As Ginsberg correctly observes, the Legislature added section 1615, subdivision (c) in response to the Supreme Court's ruling in *In re Marriage of Bonds* (2000) 24 Cal.4th 1 (*Bonds*).  There, Sun, the unemployed fiancée of professional baseball player Barry Bonds signed

37

a premarital agreement Bonds' attorney prepared shortly before the parties' wedding without consulting legal counsel. (*Bonds*, *supra*, 24 Cal.4th at pp. 6-7.) At issue during the parties' subsequent divorce was whether Sun, whose native language was Swedish, signed the premarital agreement voluntarily. (*Id.* at p. 6.) After weighing a variety of factors, including Sun's lack of counsel, the trial court concluded she did. The court of appeal reversed, holding that Sun's lack of counsel mandated strict scrutiny of the voluntariness of the agreement. (*Ibid.*; see also *id.* at p. 11.) The Supreme Court held that the trial court's approach had been correct: representation by independent counsel was but one of several factors a trial court must consider in determining whether a premarital agreement was voluntarily executed. (See *id.* at pp. 6, 17-19, 24.) It further held that the party seeking to block enforcement of the premarital agreement had the burden of proving that he or she entered into the agreement involuntarily. (*Id.* at p. 24.) Various Legislative committee analyses noted that the bill amending section 1615 was "in specific response to [ ] *Bonds*." (Sen. Judiciary Com., analysis of Sen. Bill No. 78 (2001-2002 Reg. Sess.), Apr. 24, 2001, p. 3; see also Assembly Com. on Judiciary, analysis of Sen. Bill No. 78 (2001-2002 Reg. Sess.), June 26, 2001, p. 7 ["[T]his measure addresses the key issues raised regarding per-merital [*sic*] agreements in both the recent *Pendleton* and *Bonds* cases."].)

As summarized in *In re Marriage of Cadwell-Faso & Faso*, *supra*, 191 Cal.App.4th at p. 956, "The Legislature responded swiftly with amendments to section 1615. [Citation.] Among other matters, the amendments added subdivision (c), which codifies the set of circumstances which, together, will defeat the default presumption that a premarital agreement was not executed voluntarily. . . . The law now *deems* that a premarital agreement is not voluntarily executed unless the court makes *all* of the five designated findings." The amendments

thus expressly codified the longstanding notion that "freedom of contract with respect to marital arrangements is tempered with statutory requirements and case law expressing social policy with respect to marriage." (*Bonds*, *supra*, 24 Cal.4th at p. 26.) The inapplicability of one specific social policy in this particular case—protection of a lower-earning spouse—does not negate the broader legislative policy of ensuring that all parties, regardless of earnings or other characteristics, enter into premarital agreements voluntarily. "The question of voluntariness must be examined in the unique context of the marital relationship" (*ibid.*), and that relationship is governed by the specific requirements of section 1615 rather than general contract principles such as those embodied in Civil Code section 1588 or Evidence Code section 622. (See *Clarke*, *supra*, 19 Cal.App.5th at p. 920-921.)

Parties cannot contravene statutes enacted for public policy reasons, such as section 1615, by private agreement or subsequent conduct such as the putative ratification here. (See Civ. Code, § 3513 ["Any one may waive the advantage of a law intended solely for his benefit. But a law established for a public reason cannot be contravened by a private agreement."].) The trial court accordingly erred in granting summary judgment on this basis. Because we conclude ratification of an involuntarily executed PMA is not possible as a matter of law, we need not and do not reach the parties' arguments as to whether the trust amendments constituted ratification as a matter of law, or whether there is a triable issue of fact as to whether ratification occurred.

C. *The trial court properly denied summary judgment on the other grounds asserted.*

We may affirm a summary judgment on any correct legal theory that the parties had an adequate opportunity to address in the trial

court.  (*California School of Culinary Arts v. Lujan* (2003) 112 Cal.App.4th 16, 22.)  Ginsberg contends that each of the other theories he asserted below was a correct one that warrants affirmance of the summary judgment.  We disagree.

1.  *Tinker's estate had standing to challenge the enforceability of the PMA, and causation remains a question of fact.*

Ginsberg contends that the causation element of the malpractice claim is lacking because no one did, or legally could, argue that the PMA was unenforceable.  He first asserts that Knapp relies on inadmissible evidence to support her contention that his alleged malpractice proximately caused her loss, namely a statement made by the mediator during mediation.  Assuming without deciding that the mediation privilege indeed precludes admission of that single statement, other evidence not properly challenged here supports Knapp's assertion that she and the other parties discovered during litigation that the PMA may be unenforceable.  It is reasonable to infer that this discovery may have affected the course of the litigation and settlement proceedings.  The tolling agreement Ginsberg and Knapp signed incorporates this very inference: "the adverse parties in the Probate  Action have recently suggested through their discovery and deposition questions that they may challenge the enforceability of the Premarital Agreement."

Ginsberg next contends the probate petitioners lacked standing to challenge the PMA in their undue influence suits against Knapp, or in a separate lawsuit on behalf of Tinker's estate, because they were not parties to the document.  He points out that neither petition alleged that the PMA was unenforceable, and that the probate petitioners did not amend the petitions to include such allegations.  He further asserts that Probate Code section 9820, which defines the powers of a personal

40

representative, authorizes only such a representative to "[d]efend actions and proceedings against the decedent, the personal representative, or the estate." (Prob. Code, § 9820, subd. (b).)

Even if we assume Ginsberg is correct with respect to the probate petitioners, he acknowledges that Mark, as executor of Tinker's estate, "could challenge the validity of the Agreement." He argues that Mark failed to do so, however, and did not "express to Knapp that the Agreement was invalid. Therefore, Knapp's contention that she would have obtained a better result in the settlement is entirely speculative and conjectural at best." This argument does not demonstrate that Ginsberg is entitled to summary judgment.

Knapp sued Tinker's estate to recover the money she spent paying off the encumbrances on the Perugia property. The provision in the PMA requiring such reimbursement was the sole basis for the suit. The suit had been pending a mere four months before it was settled as part of the global settlement. Mark's failure to contest the validity of the PMA during that short time does not establish that he would not have done so had the litigation proceeded. As noted above, the tolling agreement Ginsberg signed acknowledged this possibility. The invalidity of the agreement sued upon is a common defense to breach of contract actions; the effect such a defense may have had on the settlement negotiations and ultimate resolution of the case is a question of fact. Where material facts are disputed, summary judgment is not appropriate.

2. *The claim is not untimely as a matter of law.*

Ginsberg contends that summary judgment was properly granted because the malpractice action is barred by the statute of limitations. Code of Civil Procedure section 340.6, subdivision (a) sets forth the statute of limitations for legal malpractice actions: "An action against an attorney for a wrongful act or omission, other than for actual fraud,

41

arising in the performance of professional services shall be commenced within one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the facts constituting the wrongful act or omission, or four years from the date of the wrongful act or omission, whichever occurs first. . . . [T]he time for commencement of legal action shall not exceed four years except that the period shall be tolled during the time that any of the following exist: [¶] (1) The plaintiff has not sustained actual injury. [¶] (2) The attorney continues to represent the plaintiff regarding the specific subject matter in which the alleged wrongful act or omission occurred. . . .”

Ginsberg contends that the alleged malpractice occurred in 2004, 15 years before Knapp filed suit in 2019. "Therefore, indisputably, Knapp filed her complaint . . . well beyond the four-year period from alleged act under Code of Civil Procedure section 340.6." This contention is unpersuasive in light of the tolling provisions contained within the statute. The statute does not begin to run until the plaintiff suffers actual injury. Knapp asserts that her actual injury occurred in October 2018, when she executed the settlement agreement; Ginsberg maintains that any injury occurred, "if at all, at the latest in February 2017 when [Knapp] sold the Perugia property and paid the mortgage from the sales proceeds as opposed to Tinker's estate." He asserts that the limitations period lapsed one year later, in February 2018. This contention is not supported by the evidence, particularly when it is construed in the light most favorable to Knapp, the non-moving party.

The PMA expressly provided, "In the event that Grant dies and there remains, for any reason(s), an encumbrance against the residence and Grant has not made the foregoing arrangements to provide for the full payment of same upon his death, Brooke shall have a lien against Grant's estate in an amount sufficient to promptly pay the full amount

42

of such lien or encumbrance so as to ensure that Brooke receives the property free and clear of any such liens or encumbrances." Thus, Knapp was not actually injured until the estate refused to honor the lien. That occurred, at the earliest, at the end of December 2017, after the estate failed to respond to Knapp's creditor's claim within 30 days of its November 28, 2017 filing. Under this scenario, Knapp would have had until December 2018 to file her suit—but she and Ginsberg entered into a tolling agreement in October 2018. That agreement tolled the limitations period until April 30, 2019; Knapp filed suit April 2, 2019.

The tolling agreement also undermines Ginsberg's alternative argument that he "did not continue to represent Knapp after March 2004." Under the express terms of the agreement, which Ginsberg signed, "following the execution of the Premarital Agreement, Ginsberg continued to represent Knapp in her dealing with Tinker, Tessler, and Tinker's counsel, Frank Glabach." Other evidence in the record, including emails and bills Ginsberg sent to Knapp years after March 2004 and his provision of advice in connection with the Sixth Amended Trust, further belies the assertion that Ginsberg stopped representing Knapp with regard to the PMA when it was signed in 2004. At the very least, there is a question of fact as to the scope of the continuing representation that precludes summary judgment.

Ginsberg also argues that Knapp "discovered or should have discovered the facts essential to her legal malpractice action at the time of execution of the Agreement." Relying on *Truong v. Glaser* (2009) 181 Cal.App.4th 102, 110, he asserts that Knapp only needed to know that Tinker was unrepresented to start the clock running, and that it was irrelevant that she was unaware of the legal theories or remedies available to her at that time. This argument, like the first, ignores the actual injury tolling provision within Code of Civil Procedure section 340.6. Moreover, as the trial court recognized, Ginsberg did not provide

43

any evidence that Knapp suffered actual injury due to the failure to comply with section 1615 at the time Tinker signed the PMA. Without an injury, the limitations period did not begin to run.

## DISPOSITION

The judgment is reversed. Knapp is entitled to her costs on appeal.

## CERTIFIED FOR PUBLICATION

COLLINS, J.

We concur:

MANELLA, P. J.

WILLHITE, J.

44